JAMES ET AL. *v.* VALTIERRA ET AL.

No. 154.   Argued March 3–4, 1971—Decided April 26, 1971*

BLACK, J., delivered the opinion of the Court, in which BURGER, C. J., and HARLAN, STEWART, and WHITE, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post,* p. 143. DOUGLAS, J., took no part in the consideration or decision of the cases.

*Donald C. Atkinson* argued the cause and filed a brief for appellants in No. 154.   *Moses Lasky* argued the cause for appellant in No. 226.   With him on the briefs was *Malcolm T. Dungan.*

*Archibald Cox* argued the cause for appellees in both cases.   On the brief were *Lois P. Sheinfeld* and *Anthony G. Amsterdam.   Warren Christopher* and *Donald M. Wessling* filed a brief for appellee Housing Authority of the city of San Jose in both cases.

*Together with No. 226, *Shaffer* v. *Valtierra et al.,* also on appeal from the same court, argued March 4, 1971.

Briefs of *amici curiae* urging affirmance in both cases were filed by *Solicitor General Griswold, Assistant Attorney General Leonard,* and *Lawrence G. Wallace* for the United States, and by *Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *George D. Zuckerman, Dominick J. Tuminaro,* and *Lloyd G. Milliken,* Assistant Attorneys General, for the Attorney General of the State of New York.

MR. JUSTICE BLACK delivered the opinion of the Court.

These cases raise but a single issue. It grows out of the United States Housing Act of 1937, 50 Stat. 888, as amended, 42 U. S. C. § 1401 *et seq.,* which established a federal housing agency authorized to make loans and grants to state agencies for slum clearance and low-rent housing projects. In response, the California Legislature created in each county and city a public housing authority to take advantage of the financing made available by the federal Housing Act. See Cal. Health & Safety Code § 34240. At the time the federal legislation was passed the California Constitution had for many years reserved to the State's people the power to initiate legislation and to reject or approve by referendum any Act passed by the state legislature. Cal. Const., Art. IV, § 1. The same section reserved to the electors of counties and cities the power of initiative and referendum over acts of local government bodies. In 1950, however, the State Supreme Court held that local authorities' decisions on seeking federal aid for public housing projects were "executive" and "administrative," not "legislative," and therefore the state constitution's referendum provisions did not apply to these actions.[1] Within six months of

---

[1] *Housing Authority* v. *Superior Court,* 35 Cal. 2d 550, 557–558, 219 P. 2d 457, 460–461 (1950).

that decision the California voters adopted Article XXXIV of the state constitution to bring public housing decisions under the State's referendum policy. The Article provided that no low-rent housing project should be developed, constructed, or acquired in any manner by a state public body until the project was approved by a majority of those voting at a community election.[2]

The present suits were brought by citizens of San Jose, California, and San Mateo County, localities where housing authorities could not apply for federal funds because low-cost housing proposals had been defeated in referendums. The plaintiffs, who are eligible for low-cost public housing, sought a declaration that Article XXXIV was unconstitutional because its referendum requirement violated: (1) the Supremacy Clause of the United States Constitution; (2) the Privileges and Immunities Clause; and (3) the Equal Protection Clause. A three-judge court held that Article XXXIV denied the plaintiffs

---

[2] "Section 1. No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town or county, as the case may be, in which it is proposed to develop, construct, or acquire the same, voting upon such issue, approve such project by voting in favor thereof at an election to be held for that purpose, or at any general or special election.

"For the purposes of this article the term 'low rent housing project' shall mean any development composed of urban or rural dwellings, apartments or other living accommodations for persons of low income, financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or a state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise. . . .

"For the purposes of this article only 'persons of low income' shall mean persons or families who lack the amount of income which is necessary (as determined by the state public body developing, constructing, or acquiring the housing project) to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding."

equal protection of the laws and it enjoined its enforcement. 313 F. Supp. 1 (ND Cal. 1970). Two appeals were taken from the judgment, one by the San Jose City Council, and the other by a single member of the council. We noted probable jurisdiction of both appeals. 398 U. S. 949 (1970); 399 U. S. 925 (1970). For the reasons that follow, we reverse.

The three-judge court found the Supremacy Clause argument unpersuasive, and we agree. By the Housing Act of 1937 the Federal Government has offered aid to state and local governments for the creation of low-rent public housing. However, the federal legislation does not purport to require that local governments accept this or to outlaw local referendums on whether the aid should be accepted. We also find the privileges and immunities argument without merit.

While the District Court cited several cases of this Court, its chief reliance plainly rested on *Hunter* v. *Erickson,* 393 U. S. 385 (1969). The first paragraph in the District Court's decision stated simply: "We hold Article XXXIV to be unconstitutional. *See* Hunter v. Erickson . . . ." The court below erred in relying on *Hunter* to invalidate Article XXXIV. Unlike the case before us, *Hunter* rested on the conclusion that Akron's referendum law denied equal protection by placing "special burdens on racial minorities within the governmental process." *Id.,* at 391. In *Hunter* the citizens of Akron had amended the city charter to require that any ordinance regulating real estate on the basis of race, color, religion, or national origin could not take effect without approval by a majority of those voting in a city election. The Court held that the amendment created a classification based upon race because it required that laws dealing with racial housing matters could take effect only if they survived a mandatory referendum while

other housing ordinances took effect without any such special election. The opinion noted:

> "Because the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race, [citing a group of racial discrimination cases] racial classifications are 'constitutionally suspect'. . . and subject to the 'most rigid scrutiny.'. . . They 'bear a far heavier burden of justification' than other classifications." *Id.*, at 391–392.

The Court concluded that Akron had advanced no sufficient reasons to justify this racial classification and hence that it was unconstitutional under the Fourteenth Amendment.

Unlike the Akron referendum provision, it cannot be said that California's Article XXXIV rests on "distinctions based on race." *Id.*, at 391. The Article requires referendum approval for any low-rent public housing project, not only for projects which will be occupied by a racial minority. And the record here would not support any claim that a law seemingly neutral on its face is in fact aimed at a racial minority. Cf. *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960). The present case could be affirmed only by extending *Hunter*, and this we decline to do.

California's entire history demonstrates the repeated use of referendums to give citizens a voice on questions of public policy. A referendum provision was included in the first state constitution, Cal. Const. of 1849, Art. VIII, and referendums have been a commonplace occurrence in the State's active political life.[3] Provisions for referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice. Nonetheless, appellees

---

[3] See, *e. g.*, W. Crouch, The Initiative and Referendum in California (1950).

contend that Article XXXIV denies them equal protection because it demands a mandatory referendum while many other referendums only take place upon citizen initiative. They suggest that the mandatory nature of the Article XXXIV referendum constitutes unconstitutional discrimination because it hampers persons desiring public housing from achieving their objective when no such roadblock faces other groups seeking to influence other public decisions to their advantage. But of course a lawmaking procedure that "disadvantages" a particular group does not always deny equal protection. Under any such holding, presumably a State would not be able to require referendums on any subject unless referendums were required on all, because they would always disadvantage some group. And this Court would be required to analyze governmental structures to determine whether a gubernatorial veto provision or a filibuster rule is likely to "disadvantage" any of the diverse and shifting groups that make up the American people.

Furthermore, an examination of California law reveals that persons advocating low-income housing have not been singled out for mandatory referendums while no other group must face that obstacle. Mandatory referendums are required for approval of state constitutional amendments, for the issuance of general obligation long-term bonds by local governments, and for certain municipal territorial annexations. See Cal. Const., Art. XVIII; Art. XIII, § 40; Art. XI, § 2 (b). California statute books contain much legislation first enacted by voter initiative, and no such law can be repealed or amended except by referendum. Cal. Const., Art. IV, § 24 (c). Some California cities have wisely provided that their public parks may not be alienated without mandatory referendums, see, e. g., San Jose Charter § 1700.

The people of California have also decided by their

own vote to require referendum approval of low-rent public housing projects. This procedure ensures that all the people of a community will have a voice in a decision which may lead to large expenditures of local governmental funds for increased public services and to lower tax revenues.[4] It gives them a voice in decisions that will affect the future development of their own community. This procedure for democratic decisionmaking does not violate the constitutional command that no State shall deny to any person "the equal protection of the laws."

The judgment of the three-judge court is reversed and the cases are remanded for dismissal of the complaint.

*Reversed and remanded.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of these cases.

MR. JUSTICE MARSHALL, whom MR. JUSTICE BRENNAN and MR. JUSTICE BLACKMUN join, dissenting.

By its very terms, the mandatory prior referendum provision of Art. XXXIV applies solely to

> "any development composed of urban or rural dwellings, apartments or other living accommodations for

---

[4] Public low-rent housing projects are financed through bonds issued by the local housing authority. To be sure, the Federal Government contracts to make contributions sufficient to cover interest and principal, but the local government body must agree to provide all municipal services for the units and to waive all taxes on the property. The local services to be provided include schools, police, and fire protection, sewers, streets, drains, and lighting. Some of the cost is defrayed by the local governing body's receipt of 10% of the housing project rentals, but of course the rentals are set artificially low. Both appellants and appellees agree that the building of federally financed low-cost housing entails costs to the local community. Appellant Shaffer's Brief 34–35. Appellees' Brief 47. See also 42 U. S. C. §§ 1401–1430.

144

> persons of low income, financed in whole or in part by the Federal Government or a state public body or to which the Federal Government or a state public body extends assistance by supplying all or part of the labor, by guaranteeing the payment of liens, or otherwise."

Persons of low income are defined as

> "persons or families who lack the amount of income which is necessary . . . to enable them, without financial assistance, to live in decent, safe and sanitary dwellings, without overcrowding."

The article explicitly singles out low-income persons to bear its burden. Publicly assisted housing developments designed to accommodate the aged, veterans, state employees, persons of moderate income, or any class of citizens other than the poor, need not be approved by prior referenda.*

In my view, Art. XXXIV on its face constitutes invidious discrimination which the Equal Protection Clause of the Fourteenth Amendment plainly prohibits. "The States, of course, are prohibited by the Equal Protection Clause from discriminating between 'rich' and 'poor' *as such* in the formulation and application of their laws." *Douglas* v. *California,* 372 U. S. 353, 361 (1963) (HARLAN, J., dissenting). Article XXXIV is neither "a law of general applicability that may affect the poor more harshly than it does the rich," *ibid.,* nor an "effort to redress economic imbalances," *ibid.* It is rather an explicit

---

*California law authorizes the formation of Renewal Area Agencies whose purposes include the construction of "low-income, middle-income and normal-market housing," Cal. Health & Safety Code § 33701 *et seq.* Only low-income housing programs are subject to the mandatory referendum provision of Art. XXXIV even though all of the agencies' programs may receive substantial governmental assistance.

classification on the basis of poverty—a suspect classification which demands exacting judicial scrutiny, see *McDonald* v. *Board of Election,* 394 U. S. 802, 807 (1969); *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966); *Douglas* v. *California, supra.*

The Court, however, chooses to subject the article to no scrutiny whatsoever and treats the provision as if it contained a totally benign, technical economic classification. Both the appellees and the Solicitor General of the United States as *amicus curiae* have strenuously argued, and the court below found, that Art. XXXIV, by imposing a substantial burden solely on the poor, violates the Fourteenth Amendment. Yet after observing that the article does not discriminate on the basis of race, the Court's only response to the real question in these cases is the unresponsive assertion that "referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice." It is far too late in the day to contend that the Fourteenth Amendment prohibits only racial discrimination; and to me, singling out the poor to bear a burden not placed on any other class of citizens tramples the values that the Fourteenth Amendment was designed to protect.

I respectfully dissent.